1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9    MANUEL RENTERIA,                          1:08-cv-00547 AWI DLB HC

10                    Petitioner,              FINDINGS AND RECOMMENDATION
                                               REGARDING PETITION FOR WRIT OF
11        v.                                   HABEAS CORPUS

12                                             [Doc. 1]
     WARDEN KEN CLARK,
13
                      Respondent.
14   _____/

15

16        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.

18                              RELEVANT HISTORY

19        On March 28, 2002, the Tulare County District Attorney's Office filed an information

20   charging Petitioner, in count I with a felony violation of California Penal Code section 187(a).[1]  It

21   was further alleged that Petitioner personally and intentionally discharged a firearm within the

22   meaning of sections 12022.53(c) and (e)(1).  Count two alleged a felony violation of section

23   12020(a), possession of a sawed-off shotgun.  (CT 35-37.)

24        On January 6, 2003, a seven-day jury trial commenced, and on January 14, 2003, the jury

25   was unable to return a unanimous verdict, with a vote of 10-2 for guilty on the murder charge and

26   the special allegation.  (CT 340-419.)  The trial court granted Petitioner's section 1118.1 motion

27   to dismiss count two, possession of a sawed-off shotgun.  (CT 390; 1RT 565-66.)

28
     _____
           [1] All further statutory references are to the California Penal Code unless otherwise indicated.

                                                  1

On January 14, 2003, the special allegation was amended to allege a violation of section 12022.53(d), that Petitioner personally and intentionally discharged a firearm which proximately caused great bodily injury and death to the victim, in place of section 12022.53(c) and (e)(1). (1RT 628.)

The matter was subsequently scheduled for a new jury trial.  (CT 428.)

On June 2, 2003, a six-day jury trial commenced, and on June 9, 2003, the jury returned a verdict of guilty on count one, murder in the first-degree.  The jury also found true the special allegation pursuant to section 12022.53(d).  (CT 435-486.)

On July 7, 2003, Petitioner was sentenced to 25-years-to-life on the first-degree murder charge and 25 years-to-life, consecutive, on the use of a firearm, for an aggregate term of 50 years-to-life.

Petitioner filed a timely notice of appeal.  On February 3, 2005, in an unpublished opinion, a divided panel of the California Court of Appeal, Fifth Appellate District reversed the judgment.  (Lodged Docs. A-C.)

Both Petitioner and the State sought rehearing in the appellate court.  (Lodged Docs. D-E.)  Rehearing was granted, and in a new unpublished opinion issued on July 20, 2005, a divided panel of the Fifth Appellate District affirmed the judgment.  (Lodged Doc. F.)

Petitioner sought review in the California Supreme Court.  (Lodged Doc. G.)  The petition raised the same claims alleged in claims six, seven, eight, and nine of the instant federal petition.  (Id.)  The California Supreme Court denied review on October 26, 2005.  (Lodged Doc. H.)

On May 31, 2006, Petitioner filed a state petition for writ of habeas corpus in the Tulare County Superior Court in case number 165023.  On June 5, 2006, the superior court mistakenly found the petition was premature.  The court further found the petition failed to state sufficient grounds for relief.  (Lodged Docs. I-J.)

On June 16, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Fifth Appellate District, which was denied on June 7, 2007.  (Lodged Docs. K-L.)

1      On July 16, 2007, Petitioner filed a state petition for writ of habeas corpus in the

2  California Supreme Court.  The petition was summarily denied on January 3, 2008.  (Lodged

3  Docs. M-N.)

4      Petitioner filed the instant federal petition for writ of habeas corpus on February 13, 2008.

5  (Court Doc. 1.)  Respondent filed an answer to the petition on September 25, 2008, and

6  Petitioner filed a traverse on October 6, 2008.  (Court Docs. 14, 15.)

7                                    STATEMENT OF FACTS[2]

8      As of May 2001, Yvette Contreras (Yvette) was 17 years old and had graduated from
   high school. She worked at a fast-food restaurant and lived with her mother. About two to three
9  months before she disappeared, Yvette confided to her mother that she was afraid to be alone,
   and she was scared that something was going to happen to her. A few weeks before she died,
10 some girls drove by their house and yelled at Yvette.

11     Appellant Manuel Renteria lived in Tulare with his mother, and his brothers Ramon and
   Lucio. Rocio Macias (Rocio) was appellant's girlfriend. Appellant also had a relationship with
12 Yvette.

13     On Saturday, May 5 or Sunday, May 6, 2001, appellant and Rocio had an angry
   conversation and broke up. Rocio was angry because appellant had several other girlfriends and
14 he was cheating on her. At trial, Rocio admitted appellant had a relationship with Yvette and that
   she viewed Yvette as a rival. However, Rocio denied that she was angry about appellant's
15 relationship with Yvette, and insisted she never confronted Yvette or fought with her.

16 ***Monday, May 7, 2001***

17     On the morning of Monday, May 7, 2001, Yvette's mother was getting ready to leave for
   work when the telephone rang around 9:00 a.m., but she missed the call. The telephone rang
18 again around 9:40 a.m., and she answered it and spoke to a man whose voice she recognized as
   belonging to "Manuel." Yvette's mother had never met Manuel in person, but she recognized his
19 voice based on his prior telephone calls to Yvette over the previous four years. Manuel frequently
   called the house to speak with Yvette, and Yvette referred to Manuel as her "friend." Yvette was
20 still asleep when he called that morning, and her mother left for work at 9:45 a.m. without telling
   her that Manuel had called.

21
       Around 10:00 a.m., appellant appeared at the residence of Anna Corp, his next-door-
22 neighbor in Tulare, asked to use the telephone, and said he was waiting for a ride. Corp stated
   appellant used the telephone, looked out the window, and then left her house. Corp saw appellant
23 walk toward a small white car, which was parked in front of appellant's house. Corp identified
   the small white car as similar to Yvette's white Hyundai Accent.[3] Both Corp and her son, Bryan
24

25     [2] The Court finds the Court of Appeal correctly summarized the facts in its July 20, 2005 opinion. (Lodged
26 Doc. F; Case No. F043462, 2005 WL 1684431.)  Thus, the Court adopts the factual recitations set forth by the
   California Court of Appeal, Fifth Appellate District.

27     [3] At the second trial, Anna Corp testified she could not see out of her right eye, and she had "a little bit" of
28 vision in her left eye. She also testified she could not remember what she told the detectives about appellant's
   clothing and what kind of car he left in. She was impeached by her prior testimony at the first trial and her statements

Urbina, stated appellant was wearing a red shirt with lettering when he asked to use their telephone on Monday morning.

Around 4:20 p.m., Yvette's mother returned home but neither Yvette nor her car were there. She checked Yvette's room and noticed that her bed was not made and the room was not clean. She thought that was unusual because Yvette liked everything to be "nice and tidy. And it was as if she just got up out of bed and took off...." Yvette's purse was still in her room. Several personal items were missing, however, including her driver's license, her social security card, her ATM card, her birth certificate, and her keys.[4]

Rocio Macias testified she went to school and work on Monday, and she did not see or speak with appellant that day.

Around 3:30 p.m., Waylon Dowdy drove along the canal bank near Avenue 184 and Road 48 to go fishing. Dowdy regularly went fishing at a particular location on the canal bank, and described the area as "really secluded," without houses or development. "It's just a bayou. It's got oak trees all along the sides of it all the way down. It's probably four or five miles long. It's a pretty long bayou." The canal was flanked by cotton and corn fields on either side. Dowdy frequently found beer bottles and cans along the canal bank, and knew that people went out there to "party." Dowdy also knew that people went hunting in the area, and he often found shotgun shells in the dirt.

As Dowdy drove westbound along the canal bank that afternoon, the sun was glaring into his front window and obstructed his view. Dowdy did not see anyone or hear anything while he was fishing, and there was no one else out there.
Around 4:30 p.m., Dowdy drove out of the area, traveling east along the same dirt path. He noticed something on the dirt, about 100 yards from where he had been fishing. He got out of his vehicle and found a "pretty good size" pool of blood with bits of bone and tissue. He also found bits of brain in the canal water. There were beer cans near the blood, but he did not see any clothing or shoes. Dowdy believed the pool of blood was already there when he drove out to his fishing spot because he would have "heard or seen anything if it would have been around." Dowdy also thought the glaring sun had prevented him from noticing it earlier. He scooped up some of the matter and put it in a plastic bag, drove home, and immediately contacted the Tulare County Sheriff's Department. The blood and bits of brain found by Dowdy were subsequently identified as consistent with Yvette's DNA profile.

Around 8:30 p.m., detectives from the Tulare County Sheriff's Department went to the canal bank with Dowdy, and he showed them where he found the evidence. There was a large pool of blood, tissue, and bone matter on the canal bank. There was a spent shotgun shell and shotgun pellets on the dirt path. Detective Frank Arnold described the scene as "open country." The canal ran east/west and bisected Road 48. A cotton field was on the north side of the canal, and a corn field was on the south side. Arnold testified the actual crime scene was about one mile off the paved road.

Also on Monday night, appellant appeared at the Porterville residence of Luisa Andrews, his brother's girlfriend, and asked to use the telephone and spend the night. He arrived on foot

to a detective that appellant was wearing a red shirt with lettering. She also conceded appellant left in a small white car which was similar to Yvette's vehicle. She never said her vision prevented her from observing appellant's clothing or the type of car he left in.

[4] Yvette's mother never recovered these personal items.

and he was not carrying anything. Andrews thought appellant's presence was unusual because he arrived without his brother, but she allowed him to use the telephone and spend the night.

At midnight, Yvette's mother contacted the Tulare Police Department and reported that Yvette was missing. Yvette's mother advised the officers about the telephone call she received on Monday morning.

***Tuesday, May 8, 2001***

On Tuesday, May 8, 2001, Detective Arnold contacted Anna Corp and learned about appellant's appearance at her house on Monday morning, and that he left in a small white car.

Around 4:00 p.m. on Tuesday, Rocio was interviewed by detectives from the Tulare County Sheriff's Department about Yvette's disappearance. This interview occurred before Yvette's body or any physical evidence was found. The detectives advised Rocio that Yvette was missing, appellant was a suspect, and that she was also viewed as a suspect.

After her interview with the sheriff's detectives, Rocio tried to find appellant. Rocio went to Yvette's house and asked Yvette's mother if she had seen appellant, because she was told that appellant was with Yvette.[5]  She also looked for appellant at Anna Corp's house. Rocio eventually found appellant's brother, Ramon, and they drove to Porterville on Tuesday night and picked up appellant from Luisa Andrews's house.

Rocio drove appellant and Ramon back to Tulare, where they dropped Ramon at his family's house, and then appellant asked Rocio to drive him to a particular location in Corcoran. Rocio was unfamiliar with the house and followed appellant's directions to Corcoran.

As we will extensively discuss, *post,* Rocio and appellant had a lengthy conversation during the drive from Tulare to Corcoran. Rocio advised him that Yvette was missing, the police were looking for him, and the police thought Yvette had been killed. Thereafter, appellant made several statements to Rocio in which he admitted he had been with Yvette, he shot her in the face, and he got rid of the gun and his clothes.

Valerie Amador lived on Bell Street in Corcoran, and appellant was her brother's friend. On Tuesday night, Amador arrived home from work and found appellant at her house. Appellant visited with Amador's brothers and spent the night at her house.

***Wednesday, May 9, 2001***

At 1:12 a.m. on Wednesday, Detective Arnold contacted appellant's brother, Ramon, at his mother's house, and asked him about a gun. Ramon said he had purchased a 12-gauge Mossberg single-barrel pump shotgun. Ramon stated he sold it and then purchased it again, and it was now sawed off. Ramon said he kept the shotgun and some rounds in his bedroom. Ramon took Detective Arnold into his bedroom and showed him that the shotgun was not there. Ramon stated he came home from work and found his gun was missing. Ramon also stated he was a felon and not allowed to have a gun.[6]

---

[5] Yvette's mother had never met Rocio but knew Yvette did not like her, and that Yvette and Rocio previously had conflicts.

[6] We will address the admissibility of Ramon's hearsay statements in section I, *post.*

At 4:30 a.m., the detectives arrested appellant at Valerie Amador's house on Bell Street in Corcoran, where Rocio had left him the previous night.[7]

Detective Martin testified he drove appellant from Corcoran back to the violent crimes office, located north of Visalia on Road 112 and Avenue 360. Appellant was seated in the front passenger seat of Martin's unmarked unit. Martin testified he took the back roads and the shortest route from Corcoran to the Visalia office. He left Corcoran and drove on Road 28 to Avenue 184, then turned north.

Martin testified appellant started to talk to him "not too long" after they left Corcoran. Appellant asked why he was being arrested. Martin replied: " You know why you're being arrested.' " Appellant paused for a few seconds and said, " 'That's really fucked up.' " Martin then said: " 'You know who the victim is.' " Appellant again paused and then said, " 'Yeah, Yvette.' "

Martin testified that appellant also asked him: " 'Are we going to drive by the crime scene?' " Martin did not reply. Martin testified during the drive to the office, he used a road which was "nearby where the [crime] scene was." As they drove past that area and turned at an intersection, Martin testified appellant did not say anything but he looked "to his right away from me as I continued driving," and he looked out the front passenger window "in the direction of the crime scene." Martin testified the crime scene was off the road and about one mile away.[8]

Also on Wednesday morning, at some point after 8:00 a.m., Yvette's small white Hyundai was found. It had been abandoned on a dirt road near a residential area in Porterville. A deputy responded to the area and opened the trunk, and found Yvette's bloody body. There was blood, hair, and brain matter on the front left side of the vehicle, and a single blood drop on the rear bumper.

Yvette's car was found just one-quarter mile away from Luisa Andrews's house, where appellant had arrived on foot on Monday night.

Michael M. lived in the residential area where Yvette's car and body were found, and recalled that day because it was a big event in the neighborhood. Michael testified that a few nights before Yvette's body was found, he saw a man drive a white car past his house and continue down the dirt road. It was dark and late at night and the male driver was the only occupant. Michael M., who was 16-years-old at the time of the second trial, testified the driver's skin was darker than his own, and the driver's hair was short on the sides and kind of short on the top. Michael claimed the white car was longer than a compact car, but admitted he testified at the first trial that the white car was similar to Yvette's white Hyundai.

At 3:30 p.m. on Wednesday, the sheriff's department conducted another interview with Rocio and arrested her, and she was taken into physical custody and booked into jail. Appellant's brother, Ramon, was also arrested at some point.

Around 7:54 p.m. on Wednesday night, after both appellant and Rocio were in custody, the sheriff's department received an anonymous 911 call from a female, who said she found a bag of bloody and burnt clothing in a rural area in Terra Bella, and the items could be related to the

---

[7] The trial court excluded Detective Arnold's testimony as to the rest of Ramon's hearsay statements, where he admitted that he knew where appellant was hiding. Ramon took the detectives to Corcoran and asked appellant to give himself up.

[8] We will address the admissibility of appellant's postarrest statements in section II, *post.*

missing girl case. The anonymous call was traced to a payphone at a Porterville gas station, and a witness stated a girl with tattoos in a red car had used the telephone. The caller was never found.

At 8:30 p.m., a deputy recovered a large plastic bag from an open field in a rural country area in Terra Bella. The bag was placed in the dirt just beyond some weeds. The bag was tied closed, and it contained partially burned clothes and papers.

### The Physical Evidence

At trial, the criminalists testified that blood and human tissue recovered from the canal bank and Yvette's car were identified as consistent with Yvette's blood, based on her DNA profile. There was blood, brain matter, and hair on the front grill, front license plate, front headlights, and front windshield of Yvette's car. There was also blood on the right front seat, by the side of the door. There was one spot of blood on the rear bumper.

Yvette's bloody body had been thrown into the trunk of her car. There were bloody scrapes on her knees, and bloody leaves in the trunk under her body. She had been killed by a close contact shotgun blast to the left side of her head. The shotgun blast was fired from the front to the back of her head, inflicted considerable destructive trauma, and destroyed the bone, brain material, and the left side of her skull. Several lead pellets were recovered from her left eye socket, and consisted of both size four and size six pellets. Such pellets could have been fired from the same shotgun if the shell had been loaded by hand.

There were fingerprints lifted from Yvette's car but the prints were only matched to Yvette; appellant and Rocio were excluded as sources of those fingerprints. There were numerous tire prints, shoe prints, beer cans, cigarette butts, and shotgun shells found at the canal bank around the area of the pool of blood. The tire prints from Yvette's car and Waylon Dowdy's car were identified, but none of the other items found at the canal bank were linked to Yvette, appellant, Rocio, or any evidence in this case.

As noted *ante,* the investigators recovered a bag of burned clothes and papers in Terra Bella. The criminalist who examined the contents of the bag determined that hair found among the clothes was consistent with Yvette's hair samples, used as references. In addition, there were telephone numbers written on the papers which were directly connected to Yvette-one number belonged to her grandmother, and another number belonged to a friend.

The bag also contained a pair of bloodstained blue pants. The bloodstains were identified as consistent with Yvette's blood, based on a DNA profile. The bloodstained pants had the same measurements as a pair of pants retrieved from appellant's residence, which appellant previously wore. A hair was recovered from the bloodstained blue pants. Appellant's pubic hair, used as a reference, could not be eliminated as the source of this hair.

A white tube sock was found in the bag. Appellant's pubic hair, used as a reference, could not be eliminated as the source of two hairs found on the white tube sock. Appellant's head hair, used as a reference, could not be eliminated as the source of one hair found on the autopsy table, presumably from Yvette's body.[9]

The bag contained a red shirt with lettering on it. Both Anna Corp and her son, Bryan Urbina, stated appellant was wearing a red shirt with lettering when he asked to use their telephone on Monday morning. The bag also contained a "Puma" jersey and a pair of "Lugs"

---

[9] The jury in the first case did not hear evidence that the bloodstained pants had measurements similar to another pair of pants worn by appellant. The first jury also did not hear any of the hair evidence.

shoes. Bryan Urbina identified the "Puma" jersey as similar to one previously worn by appellant. Bryan Urbina also identified the "Lugs" shoes as similar to a pair which appellant showed him shortly before the murder. Appellant told Bryan that he just bought the shoes with his last paycheck.

Finally, the bag contained a piece of paper with a picture of "Marvin the Martian" on it. There were two hairs on this paper, and the hairs could not be eliminated as coming from Yvette, using her head hair as a reference. These two hairs were found not to be similar to reference samples from appellant or Rocio.

***Rocio's Trial Testimony***

Rocio, appellant's girlfriend, testified at appellant's preliminary hearing and was subject to extensive cross-examination. At both trials, however, she refused to testify pursuant to the Fifth Amendment and was thus unavailable. (Evid.Code, § 240.) At both trials, Rocio's preliminary hearing testimony was read to the jury pursuant to the former testimony exception to the hearsay rule. (Evid.Code, § 1291.)[10]

Rocio testified, as set forth *ante,* about being contacted by sheriff's detectives on Tuesday, May 8, 2001, that she learned Yvette was missing, and both appellant and Rocio were suspects. Rocio also testified about her efforts to find appellant, and that she drove Ramon to Porterville and they picked up appellant at Luisa Andrews's house. Rocio and appellant dropped off Ramon at the Renteria's house in Tulare, and then Rocio drove appellant to Valerie Amador's house in Corcoran.

Rocio testified that during the drive to Corcoran, she told appellant about her interview with the sheriff's detectives and "what they had told me," that appellant "was a possible suspect and that [Yvette] had been missing." As Rocio testified about this conversation, she was initially hostile toward the prosecutor and somewhat equivocal as to what appellant told her. On direct examination, Rocio testified she told appellant everything the detectives told her: that the sheriff's department was looking for him, Yvette was missing, someone had been shot, and he was a suspect. Rocio testified she was angry and emotional as she talked with appellant, and she started to cry because she did not know what to think or believe. Rocio kept "pushing the subject", and appellant became upset because she wouldn't drop the subject. "I told him what the detectives told me, and he said, 'Yeah, is that what you want to hear?' And he just repeated everything back to me."

Rocio claimed she repeatedly confronted appellant with the detectives' information that "somebody had gotten shot" and Yvette was missing. "And he just said, 'Yeah, okay. Is that what you want to hear? Yeah.' He was just-everything I told him about somebody getting shot and him being missing, he repeated everything back." Appellant yelled at Rocio to shut up because he did not know what she was talking about. Rocio again told him that someone had been shot "and he had something to do with it and that he was a suspect." Appellant replied: " All right. Is that what you want to hear? Yeah, somebody got killed. There. Does that make you happy?' Stuff like that...." "I told him someone got shot, and he goes, 'Okay. Yeah. I shot her, yeah. Is that what you want to hear?' " Appellant never said he killed Yvette "in those words," and never said

---

[10] The jury herein heard the complete transcript of Rocio's lengthy preliminary hearing testimony. The court advised the jury that Rocio's testimony was from a prior proceeding and she was unavailable as a witness in this case. The jury also heard the parties' objections and the court's rulings therein, as they occurred at the preliminary hearing. Appellant requested the court to advise the jury of his original objections at the preliminary hearing, and raised additional objections to some aspects of the testimony, but appellant did not object to the reading of the transcript and implicitly acknowledged it was admissible pursuant to the former testimony exception.

Yvette's name, but Rocio testified appellant was clearly talking about Yvette.

As her direct examination continued, however, Rocio testified she pressed appellant for "a lot of reasons" and asked if it was true. In response, appellant volunteered information about Yvette which went beyond simple repetitions of what Rocio reported about her interview with the sheriff's detectives. Rocio testified appellant made several statements which contained information she did not know about. As her testimony continued, Rocio was still hesitant to repeat appellant's statements, but she was confronted by the transcript of her interview with the sheriff's detectives and testified to appellant's statements.

Thereafter, Rocio testified appellant "blurted ... out" certain things about Yvette and he said "all that at once." Appellant told Rocio that " '[s]omebody's head got shot' "; "the side of her face was blown off"; they were hanging out and messing around and he "just shot her"; Yvette "just turned around" before he shot her; " 'he will never forget that face' "; he had a beer and she had a soda; just before he shot her, Yvette said " 'are you going to shoot me or something?' "; that "it was a gun"; he did not have the gun on him; he left the gun back "over there" to "get cleaned" and "get rid of"; his clothes "must have got burnt"; and he got rid of everything, and he got rid of his shoes and clothes.

On cross-examination, Rocio returned to her story that appellant merely repeated what she told him. Rocio testified that appellant said " [f]ine, whatever you say,' " and "[i]s that what you want to hear," as a way to get her to shut up and "pacify" her. Also on cross-examination, Rocio testified she asked to see a priest because she felt bad that she initially lied to the detectives about "something this big."

On redirect examination, Rocio testified she did not want appellant to kill Yvette and she did not want appellant to tell her that he killed Yvette.

"Q ... Were those things that you wanted to hear on Tuesday night on the trip from Tulare to Corcoran?
"A No.
"Q Did you want [appellant] to kill Yvette?
"A No.
"Q Did it make you happy when he told you that he had blown the side off somebody's face?
"A No. [¶] ... [¶]
"Q Were you trying to get [appellant] to say those things to you?
"A No."

Also in her testimony, Rocio admitted she smoked marijuana on a daily basis in April and May 2001. She used both marijuana and methamphetamine during the week that Yvette disappeared because she did not want "to think or believe" the things the detectives told her about the case. Rocio had never been to the canal bank where the pool of blood was found. Finally, Rocio admitted that she kept a "Marvin the Martian" doll and poster in her bedroom, and it was her favorite cartoon character. She had never seen the "Marvin the Martian" paper recovered from the bag of burned items, but admitted that she kept some of her "stuff" at appellant's house. She did not know anything about the bag of burned clothes and papers found in Terra Bella, denied any of the contents belonged to her, and denied that she helped appellant or anyone else burn evidence in this case.[11]

---

[11] The anonymous telephone call about the bag of burned clothes was received after Rocio was arrested and taken into custody.

Rocio further testified that she had previously pleaded no contest to being an accessory after the fact (§ 32), her bail was reduced, and she was out on bail while awaiting her sentencing hearing. Rocio did not know if she was "getting a deal" and did not know what to expect, but she was "here to tell you what I know so I can get out of this mess."

### Additional Trial Evidence

Jose, an inmate serving a life term for murder, testified as a prosecution witness about several conversations he had with appellant while they were in custody at the Tulare County jail in May 2001.[12] Jose testified appellant said he was in custody for killing a little girl, and told him "everything that happened that day of the murder." According to Jose, appellant said he wanted to do something crazy that day and "shoot all the southerners and the teachers" at his school. Instead, Yvette "drove up ... [and] they drove around for a couple of hours" and bought some drinks at the store. Appellant said he had a sawed-off shotgun with him. Yvette was driving, and appellant told her to drive out to the country. Appellant told Yvette to get out of the car. Yvette went to the back of the car at the trunk, and appellant told her to face away from him and toward the car. Appellant said she was crying and begging for her life, and he thought it was funny. He shot her in the back of the head while she was standing at the trunk of her car. Appellant said the shotgun blast knocked some of brain and skull matter on the car and he threw it away.[13] He put her body in the trunk, and drove to a car wash to clean the car.

Jose testified that appellant said he dumped the car, and his girlfriend and his brother followed him when he dumped the car. They also took him to Corcoran to hide out. Appellant told his brother to hide the shotgun. Appellant said he put his clothes in a trash bag and threw it in a dumpster. Jose testified he was not sure whether appellant said he dumped the car and/or the bag of clothes in Porterville or Terra Bella.

Jose testified he had been a prosecution witness in this case a number of times, no one from the district attorney's office made any promises in exchange for his testimony, and he did not obtain a better sentence in his own case. Jose explained that after appellant's first trial, it took two and one-half weeks for the sheriff's department to transfer him back to state prison, and he lost his cell and his prison job. In anticipation of the second trial, the sheriff's department promised to expedite his return to prison so he would not have the same problems. Jose wanted to testify against appellant because it was "the right thing to do" and Yvette was "somebody's daughter" and could have been "my little sister." Jose conceded he would be eligible for parole in 17 years, and his appearance in this case could be a "small factor" for the parole board to consider.

Jose admitted he knew Gerald Martinho, who was also in custody with him. Jose denied that he asked Martinho to back up his story about appellant. Jose was impeached with his prior testimony that he might have asked Martinho to back up his story, and that he was desperate. Jose also admitted that he contacted a sheriff's deputy in September 2001 about appellant's alleged confession, that it was after his own murder trial, and that he was trying to get a deal after his trial. Jose further admitted that he offered to testify in appellant's case "and a couple of other ones" involving other inmates, and that he had been housed in a unit "with nothing but

---

[12] During the motions in limine at the second trial, the prosecutor advised the court that Jose had testified at the first trial as to appellant's alleged jailhouse confession, but he was very concerned about his name being published in the newspaper. The court granted the prosecutor's request that Jose would only be referred to by his first name during the course of the second trial.

[13] Jose's account conflicts with the physical evidence because blood and brain matter were found on the front grille of Yvette's car, and just a single drop of blood was found on the rear bumper

murderers." Jose admitted that he told the deputy that he was willing to lie on the stand for the purpose of getting a deal. Finally, Jose admitted that he read about Yvette's homicide in local newspapers, but denied that he used such information for his testimony.

Gerald Martinho testified for the defense that he was in custody with Jose, and Jose asked him to "go along with a story" about appellant so Jose could get a deal in his murder case. Martinho testified that he knew nothing about the case and refused to help Jose. Martinho admitted he had two felony convictions for moral turpitude offenses, and one prior violent felony conviction.

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.      Ineffective Assistance of Counsel

Petitioner contends that defense counsel was constitutionally ineffective in several different ways.  First, he contends counsel should have conducted further research in an attempt to exclude expert testimony on the hair comparison evidence presented at trial.  He specifically claims counsel should have presented a number of additional scientific and legal publications in order to show that hair comparison is insufficiently reliable to be used for identification purposes.

He further contends that, even if such publications might have been insufficient to exclude the expert testimony, counsel should have used these same publications on cross-examination to impeach the expert witness.  (Petition, at 13-28.)

Second, Petitioner contends counsel did not conduct a sufficient investigation to present his argument that the hair evidence was unreliable because it was allegedly "planted" by law enforcement.  (Petition, at 29-33.)

Third, Petitioner contends counsel was incompetent by allowing Rocio Macia's testimony from the preliminary hearing to be read to the jury without requiring her to testify at trial.  He claims counsel should have challenged Macia's invocation of her Fifth Amendment privilege at trial because (1) she allegedly had no Fifth Amendment privilege, (2) the re-reading of her preliminary hearing testimony violated the Confrontation Clause of the Sixth Amendment, and (3) he was prejudiced by allowing the prior testimony to be read without requiring Macias to actually testify in open court.  (Petition, at 34-42.)

In denying Petitioner's claim, the last reasoned decision of the state appellate court, held:

> The "Petition for Writ of Habeas Corpus," filed in this court on June 16, 2006, is denied.  With regard to the hair comparison evidence, petitioner has failed to provide a declaration from counsel with respect to his tactical considerations and extent of his research and investigation or show why petitioner should not be required to submit such a declaration.  (*People v. Tello* (1997) 15 Cal.4th 264 [insufficient assistance of counsel claims on appeal almost never can be meritorious absent affirmative evidence of counsel's reasons for his actions or inactions].)  With respect to petitioner's claim that trial counsel should have attempted to obtain immunity for Rocio Macias or argued that her Fifth Amendment rights were waived, petitioner has failed to provide any declaration from trial counsel showing that he lacked a tactical reason for such failures.  (*Ibid*.)  Petitioner has also failed to make any showing regarding what Rocio Macia's testimony would have been had she been granted immunity or her privilege deemed waived or failed to explain why he should not be required to make such a showing.  With respect to petitioner's arguments regarding the autopsy hair, petitioner has failed to show why the probative value of the hairs from the bag of clothes containing the victim's blood did not render the admission of the autopsy hair redundant.

(Lodged Doc. L.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

the petitioner must show that counsel's performance was deficient, requiring a showing that

counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

representation fell below an objective standard of reasonableness, and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment

considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

(9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive

defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

(2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

have been different.

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable

application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

1058, 1062 (2000).

////

1        1.      Failure to Challenge Hair Comparison Evidence

2        _____Prior to the second trial, defense counsel sought to exclude the hair comparison evidence

3   as inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and

4   Williamson v. Reynolds, 904 F.Supp. 1529, 1558 (E.D. Okla. 1995).  Counsel argued that the

5   court was required to conduct a *Kelly/Frye*[14] hearing prior to admission of the evidence and such

6   hearing would demonstrate the hair comparison analysis was unreliable.

7        _____The prosecutor argued that the evidence was admissible in California pursuant to People

8   v. Pride, 3 Cal.4th 195 (1992).  He indicated that Criminalist Nancy McCombs would testify that

9   the hair samples were similar to Petitioner's samples, but there was no positive way to identify

10  Petitioner.  The court allowed the expert testimony and did not conduct a *Kelly/Frye* hearing.

11  (Lodged Doc. F, at 98.)

12       _____During trial, the prosecution introduced the hair comparison evidence which was

13  collected from the victim, the bag of burned clothes, and from the autopsy table.  (RT 439-442.)

14  McCombs, who had previously testified as an expert in the area of hair comparisons, examined

15  the hairs from the victim's hand, car, and from papers in the burned bag finding them similar to

16  the victim's sample of head hair but not similar to Petitioner's head hair.  (RT 519-521.)  Two

17  hairs taken from the white socks in the burned bag of clothes could not be excluded from the

18  sample of Petitioner's pubic hair.  (RT 523.)  A hair recovered from the pants found in the same

19  burned bag also could not be excluded from a sample of Petitioner's head hair.  (RT 524.)  In

20  addition, one of the hairs found on the autopsy table also could not be excluded from the sample

21  of Petitioner's head hair.  (RT 524.)

22       On cross-examination, McCombs clarified that by stating the hairs were similar, it simply

23  meant that she could not find anything dramatically different between them; it did not mean that

24  she could say a certain hair came from a particular source or person:

25          It means that there are characteristics that are shared by both of those hairs that are
            similar.  It's not a strong statement like an elimination is. [¶] If I took my hair and
26          mounted it and I took this young lady's hair and mounted it, I could probably
            eliminate our hairs from coming from the same source.  That's a strong statement.

27

28  _____
    [14] See People v. Kelly, 17 Cal.3d 24 (1976); Frye v. United States, 293 F.1013 (D.C. Cir. 1923).

15

[¶] Inconclusive, which is another one of the statements, means that when I'm looking at two hairs, either there's not enough information there.  Maybe the hair was cut, there was some features that looked similar, but some that didn't, to lead me to just not feel comfortable saying they looked similar or not similar. [¶] When I say similar, I can't really find anything dramatically different.  But does that mean that that hair came from that source?  No.

(RT 529-530.)

As he did to the state courts, Petitioner presents numerous scientific and legal articles expressing concern over the use of hair comparison evidence for identification purposes. Petitioner contends defense counsel should have discovered these publications and used them to bolster his argument to suppress such evidence under *Kelly/Frye* and to impeach McCombs' testimony as unreliable.

The state trial court and appellate court properly found that under California law, hair comparison evidence that identifies a suspect or victim as a possible donor is routinely admitted in criminal cases without any concern of unreliability under *Kelly/Frye*.  See People v. Pride, 3 Cal.4th 195, 238-239 (1992); People v. Cooper, 53 Cal.3d 771, 799 (1991); People v. Bonin, 47 Cal.3d 808, 823 (1989).  Petitioner's discovery of the publications would not have changed the trial court's ruling because it was bound by the California Supreme Court's repeated findings on this issue.  See Auto Equity Sales, Inc. v. Superior Court, 57 Cal.2d 450, 455 (1962).  (Lodged Doc. F, at 100.)   Therefore, the alleged actions counsel failed to undertake would have been futile and any objection or motion would have been denied.  See e.g. United States v. Quintero-Barraza, 57 F.3d 836, 841 (9th Cir. 1995); James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994); United States v. Aguon, 851 F.2d 1158, 1172 (9th Cir. 1988); Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985).

Moreover, as pointed out by the state appellate court (in addressing the related claim of evidentiary error, discussed *infra*), the scientific community and courts have overwhelmingly found hair comparison evidence reliable.  (Lodged Doc. F, at 99-102.)  It is reasonable to assume that McCombs would have been aware of such publications, been aware of the overwhelming consensus refuting them, and been able to provide such information in response to questioning on the issue.

1   Furthermore, the articles cited by Petitioner did not have much value in terms of

2   impeachment.  The articles deal with hair comparison being admitted for identification purposes.

3   To the contrary, here, McCombs was unequivocal in explaining to the jury that she *could not*

4   indicate that the recovered hairs had in fact come from Petitioner.  Rather, she could only

5   conclude that Petitioner's sample hairs *could not be excluded* from a few of the various hairs

6   recovered from the autopsy table or from the burned bag of clothing.  Given McCombs'

7   testimony that such evidence was not sufficient itself to make an identification of anyone, it is

8   highly unlikely impeachment with the articles would have been of any value to Petitioner.

9   Accordingly, Petitioner has failed to demonstrate that defense counsel was incompetent for

10  failing to discover and use such articles or that he was prejudiced thereby, and his claim fails

11  under Strickland, 466 U.S. at 688.

12        2.     Failure to Challenge "Planted" Hair Evidence

13  At trial, McCombs testified that one of the hairs found on the table during the victim's

14  autopsy could not be excluded from a sample of Petitioner's head hair.  (RT 524.)  Petitioner

15  now contends that counsel should have challenged such testimony because he claims it was

16  somehow "planted" by law enforcement.  Petitioner points to a numerical discrepancy in the

17  record in support of his argument.  He correctly indicates that McCombs' investigative report and

18  her trial testimony both state that she examined a total of *six* hairs recovered from the autopsy

19  table.  However, an earlier investigative report notes only *four* hairs recovered from the table.

20  Petitioner contends counsel was constitutionally ineffective for failing to recognize and use this

21  discrepancy to argue that law enforcement had somehow "planted" the hair sample used against

22  him.

23        It appears that the discrepancy is merely a clerical error or mishap during the handling or

24  transportation of the evidence.  There is no evidentiary foundation to support Petitioner's

25  conclusory claim that law enforcement somehow "planted" such evidence.  Petitioner fails to

26  demonstrate who or how a particular individual would have had access to Petitioner's sample

27  hair and to evidence of recovered hairs such that he/she would have been able to "plant" the

28  evidence.  In addition, Petitioner fails to demonstrate why law enforcement would "plant"

17

evidence that merely established he "could not be excluded" as a source of that single hair.

Without such crucial evidence, trial counsel cannot be faulted for not advancing an unfounded argument of police corruption. Raising such an argument, based only on the numerical discrepancy in the reports, would have been futile and served only to diminish counsel's credibility before the Court.

Furthermore, the claim fails on the ground that the comparison evidence of Petitioner's head hair was essentially "redundant" to the comparison of his pubic hairs to those found in the burned bag. (Lodged Doc. L.)  Although the single hair at issue from the autopsy table presumably came from the victim's body, it was relatively insignificant in light of the damning evidence recovered from the burned bag of clothes, which included hair that arguably liked Petitioner to the victim and murder.

Based on the lack of evidence to support Petitioner's claim, it simply cannot be said that counsel was constitutionally ineffective for failing to raise such a frivolous argument. The state court reasonably rejected this claim as without any merit.

3.     Failure to Challenge Rocio Macias's Prior Testimony

At the time of Petitioner's second trial, his former girlfriend Rocio Macias had pled no contest to being an accessory after the fact for her involvement in this case, and she was awaiting sentencing for that charge. (Lodged Doc. F, at 16.)  Despite having exercised her Fifth Amendment right against testifying at Petitioner's first and second trials, Macias testified at Petitioner's preliminary hearing and was subject to cross-examination.  At the time of both trials, the court found that she was "unavailable" as a witness within the meaning of California Evidence Code section 240.  Pursuant to the "former testimony" exception to the hearsay rule under California Evidence Code section 1291, the court allowed Macias's preliminary hearing testimony to be read to the jury. (Lodged Doc. F, at 12.)

Petitioner contends that counsel was incompetent by failing to challenge the admission of Macias's preliminary hearing testimony on the ground that she could not exercise her Fifth Amendment privilege because she had previously pled no contest for her involvement in the case.  It appears that Petitioner contends counsel should have sought to exclude the former

1  testimony or forced her to testify in open court, and the result might have been different had she

2  been forced to take the stand.

3       Petitioner's claim is legally unsound.  There is no doubt that Macias retained her Fifth

4  Amendment privilege against self-incrimination when called as a witness at Petitioner's second

5  trial.  A defendant retains his/her Fifth Amendment privilege against self-incrimination prior to

6  sentencing, even after a guilty plea, due to the possible impact such testimony may have on the

7  yet undermined sentence.  See e.g. United States v. Kuku, 129 F.3d 1435 (11th Cir. 1997); United

8  States v. De La Cruz, 996 F.2d 1307, 1312-1313 (1st Cir. 1993); United States v. Hernandez, 962

9  F.2d 1152, 1161 (5th Cir. 1992); United States v. Lugg, 892 F.2d 101, 103 (D.C. Cir. 1989).

10  Therefore, although Macias had entered a no contest plea, she had not yet been sentenced and

11  clearly retained the right to exercise her Fifth Amendment privilege against self-incrimination.

12       In addition, because Macias' invocation of the Fifth Amendment rendered her

13  "unavailable" as a witness, and Petitioner had more than ample opportunity to cross-examine her

14  at his preliminary hearing, there was no Confrontation Clause violation.  Crawford v.

15  Washington, 541 U.S. 36, 53-54 (2004).  Trial counsel, therefore, had no basis upon which to

16  challenge Macias's invocation of the Fifth Amendment or to raise a Confrontation Clause

17  objection, and could not have rendered ineffective assistance.

18  D.    Due Process Challenge

19       Petitioner contends that the state courts' summary denials of his state habeas applications

20  violated California law and habeas procedure.  (Petition, at 47-52.)  "[T]he availability of a claim

21  under state law does not of itself establish that a claim was available under the United States

22  Constitution." Sawyer v. Smith, 497 U.S. 227, 239 (1990), quoting, Dugger v. Adams, 489 U.S.

23  401, 409 (1989).  Because Petitioner's claim arises strictly under state law, it is not cognizable in

24  the instant federal habeas corpus petition.  Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir.

25  1997); Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989).

26  E.    Sixth Amendment Confrontation Clause Violation

27       On direct appeal, Petitioner claimed that evidence of his brother Ramon's out-of-court

28  statements to the police were not admissible because, among other things, they prejudicially

violated his Sixth Amendment right to confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  While the state appellate court found the challenged evidence constitutionally inadmissible under <u>Crawford</u>, it found the error was harmless beyond a reasonable doubt.

In a very thorough opinion, the state appellate court initially found that Ramon was not available as a witness.  The court noted that at the time of the preliminary hearing in March 2002, Ramon had plead guilty to being an accessory after the fact (§ 32), and was serving a sentence for that conviction.  At the preliminary hearing, Ramon expressed his desire to not take the stand and stated "I just don't want to be a part of these proceedings."  Although the prosecutor offered him use immunity, he continued to refuse to testify and the court held him in contempt.  However, Detective Arnold testified at the preliminary hearing regarding his conversations with Ramon.  As stated by the appellate court,

> Detectives Arnold and Martin contacted Ramon at his mother's house around 1:00 a.m. on May 9, 2001.  Ramon did not want to cooperate, but he spoke with his mother and received permission to speak to the officers.  Ramon said that he knew where [Petitioner] was, that he took [Petitioner] to Corcoran, and that his Mossberg sawed-off shotgun was missing.  Ramon offered to show the officers where [Petitioner] was hiding, and he wanted to go with them to make sure [Petitioner] turned himself in.  They left Ramon's house around 3:00 a.m. and drove to Corcoran, and arrested [Petitioner].
> Detective Arnold also testified that he tape recorded his interview with Ramon, and referred to the transcript during his testimony.  During cross-examination, Arnold admitted Ramon never said that [Petitioner] admitted he killed Yvette.  Also during the tape-recorded interview, Ramon said that he asked [Petitioner] what happened to his gun, and [Petitioner] said he took the gun.  The record infers the tape-recorded interview occurred before Ramon led the officers to [Petitioner's] location in Corcoran, primarily because Ramon stated in the transcript that he had talked to [Petitioner], [Petitioner] did not know what to do, and [Petitioner] would not talk to him about the case over the telephone because he would think the police were listening.

(Lodged Doc. F. at 19-20.)

At the time of Petitioner's second trial, Ramon had served his sentence for being an accessory after the fact, and was subsequently deported to Mexico upon his release from custody.  The trial court held an evidentiary hearing to determine the admissibility of Ramon's hearsay statements.  The trial court "found Ramon was unavailable as a witness and rejected [Petitioner's] arguments on that issue.  The court also found Ramon's statements about the missing shotgun were probative and admissible as declarations against his penal interest.

However, the court found Ramon's initial refusal to disclose [Petitioner's] whereabouts had no probative value and was not admissible.  The court also excluded Ramon's statements that he thought [Petitioner] took the gun, and that Ramon told the officer's that [Petitioner] was hiding in Corcoran."  (Lodged Doc. F, at 21-25.)

The state appellate court found that Ramon's statements were admitted in violation of Crawford v. Washington, 541 U.S. 36, which held that the Confrontation Clause of the Sixth Amendment bars the state from introducing out-of-court statements which are testimonial in nature, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the declarant.

The appellate court specifically held as follows:

> In the instant case, [Petitioner] relies on Crawford and asserts Ramon's hearsay statements were testimonial and inadmissible because Ramon was not truly "unavailable" within the meaning of Evidence Code section 240, and Ramon was never subject to cross-examination.  We have already concluded that Ramon was unavailable, but he was obviously never subject to cross-examination.  Thus, we must determine whether Ramon's statements were "testimonial" within the meaning of *Crawford*.  Again, we must look to Detective Arnold's testimony at the evidentiary hearing, rather than his limited trial testimony, to resolve this issue.

> The record seems to infer that Detective Arnold's conversation with Ramon might have been the result of a brief encounter at his house in the early morning hours, in which Arnold asked about [Petitioner's] whereabouts and whether Ramon knew anything about a shotgun.  Such a brief, limited interview between the detective and the subject would present a close question as to whether a structured police interview occurred and Ramon's statements about the shotgun were testimonial and subject to *Crawford*.

> A close examination of the entire record, however, reflects that Ramon's statements to Detective Arnold were testimonial and subject to *Crawford*.  The entirety of Arnold's testimony, particularly at the second trial, reflects that he conducted a tape-recorded, structured interview with Ramon and raised several topics regarding Yvette's disappearance.  The detective had clearly focused on [Petitioner] as the subject of the homicide investigation, and he presented Ramon with a series of specific questions: when did he last see [Petitioner], did he know anything about a shotgun, what did [Petitioner] say to him over the telephone, where was [Petitioner] hiding, and whether [Petitioner] admitted that he shot Yvette.  During the tape-recorded interview, Ramon admitted he knew where [Petitioner] was hiding, and also admitted that his shotgun was missing.

> As in *Crawford* and *Sisavath*, Ramon's statements to the detective about the shotgun were knowingly given in response to structured police questioning. . . . An objective observer would reasonably expect that Ramon's responses to questioning regarding [Petitioner's] whereabouts and his access to a shotgun would be available for use in a subsequent prosecution for Yvette's homicide, and

his statements were thus testimonial within the meaning of *Crawford*.  While Ramon was unavailable as a witness, and his statements satisfied the statutory requirements for a declaration against interest, he was never subject to cross-examination and, as in *Crawford*, the admission of his hearsay statements violated [Petitioner's] Sixth Amendment right to confront and cross-examine witnesses.

(Lodged Doc. F, at 38-40.)

The appellate court went on to address the impact of the <u>Crawford</u> error on Petitioner's

conviction for murder and ultimately found the error harmless holding, in part, as follows:

As to the jury's verdict of murder, [Petitioner] asserts the admission of Ramon's hearsay statements "was 'crucial' to the prosecution's case and 'devastating' to the defense."  However, the overwhelming weight of the physical, direct, and circumstantial evidence rendered the Crawford error harmless beyond a reasonable doubt.  First, the physical evidence directly connected [Petitioner] with Yvette's violent death.  The bag of partially burned clothes was obviously connected to Yvette's death: it contained hair consistent with Yvette's reference samples, and papers with telephone numbers directly connected with Yvette.  The bloodstains on the blue pants were consistent with Yvette's blood, based on a DNA profile.  The pants had the same measurements as a pair of pants retrieved from [Petitioner's] residence, which [Petitioner] previously wore. [Petitioner's] pubic hair, used as a reference, could not be eliminated as the source of a hair recovered from the bloodstained pants, and the source of two hairs recovered from the white tube sock. [Petitioner's] head hair, used a reference, could not be eliminated as the source of one hair found on the autopsy table, presumably from Yvette's body.

The circumstantial evidence was extremely strong and placed appellant with Yvette just before she was murdered. At 9:45 a.m. on Monday, Yvette's mother intercepted a telephone call from a man whose voice she recognized as belonging to "Manuel." Yvette's mother knew "Manuel" was Yvette's friend, but did not tell Yvette about the call. At 10:00 a.m., appellant arrived at his neighbor's house, used the telephone, and said he was waiting for a ride. Anna Corp watched appellant get into a small white car, which she admitted was similar to Yvette's white Hyundai.

Corp and her son, Bryan Urbina, stated appellant was wearing a red shirt with lettering that morning. The bag of partially burned clothes contained a red shirt with lettering. The bag also contained a "Puma" jersey and a pair of "Lugs" shoes. Bryan identified the "Puma" jersey as similar to one previously worn by appellant. Bryan identified the "Lugs" shoes as similar to a pair which appellant showed him shortly before the murder; appellant said he bought the shoes with his latest paycheck.

The circumstantial evidence also placed appellant in the vicinity of Yvette's body, which was dumped into the trunk of her car. Yvette's car had been abandoned on a dirt road near a residential area in Porterville. A resident recalled that a man drove a white car on this dirt road and passed his house just a few nights before Yvette's body was found. The driver was the only occupant, and the resident admitted the white car was similar to Yvette's Hyundai. The location where Yvette's car was abandoned was just one-quarter mile away from Luisa Andrews's house, where appellant arrived, on foot, on Monday night. Andrews

22

was his brother's girlfriend. She thought it was unusual for appellant to appear without him, but she let him stay overnight.

In addition to the physical and circumstantial evidence, the jury heard direct evidence of appellant's guilt through the testimony of Rocio Macias, who recounted her emotional conversation with appellant on Tuesday night, as she drove him to Corcoran. Rocio had already been interviewed by the sheriff's detectives, and she knew Yvette was missing and that appellant was a suspect. She confronted appellant with this information, and he initially repeated whatever she said to get her to shut up.

Rocio admitted, however, that appellant volunteered information about Yvette which went far beyond simple repetitions of what Rocio reported about her interview with the sheriff's detectives, and said certain things which would not have been known to anyone but the killer. Rocio testified appellant "blurted ... out" certain things about Yvette: that " '[s]omebody's head got shot'"; "the side of her face was blown off"; they were hanging out and messing around and he "just shot her"; Yvette "just turned around" before he shot her; " 'he will never forget that face'"; he had a beer and she had a soda; just before he shot her, Yvette said " 'are you going to shoot me or something?'"; that "it was a gun"; he did not have the gun on him; he left the gun back "over there" to "get cleaned" and "get rid of"; his clothes "must have got burnt"; and he got rid of everything, and he got rid of his shoes and clothes.

Rocio's testimony about appellant's statements is crucial because appellant revealed chilling details about the murder which were consistent with the evidence, and went far beyond repeating whatever Rocio had learned during her interview with the detectives. When appellant spoke to Rocio on Tuesday, he discussed how he killed Yvette and said he burned his clothes and shoes. Appellant made these statements to Rocio on Tuesday, one day before the police found Yvette's body in the trunk of her car and recovered the bag of burned clothes which contained blood consistent with Yvette's DNA profile, and hair which could not be eliminated as coming from appellant, based on his reference samples. These details-that he shot her in the head, and he burned his shoes and clothes-were consistent with the subsequent discovery of Yvette's body, the fatal head wound, and the bag of burned clothing, all of which were found the day after appellant confessed to Rocio.

Appellant asserts Rocio's testimony is not credible because she was also a suspect, she later pleaded guilty to being an accomplice, and she had the motive to shift blame to appellant. Rocio's testimony was not presented to the jury in a vacuum, however, and the jury was well aware of Rocio's possible involvement in this case. Rocio admitted she viewed Yvette as a rival and they did not get along. Rocio knew the detectives believed Yvette had been murdered, and that she was also considered a suspect in a murder case. Appellant was arrested Wednesday morning and Rocio was arrested Wednesday afternoon, even before the bag of partially burned clothing was found on Wednesday night. The jury was also advised that at the time of her testimony, Rocio had pleaded no contest to being an accessory, her bail had been reduced, and her sentencing hearing was pending.

Rocio was clearly involved as an accessory after the fact in this case. She helped appellant evade arrest by driving him to Corcoran so he could hide there on Tuesday night, even after he confessed to her that he killed Yvette. The physical evidence, however, provides the answer as to appellant's implication that Rocio lacked credibility because she was the actual killer of Yvette. The criminalists who examined the blood and hair evidence compared it with reference samples from Yvette, appellant, and Rocio. None of the physical

evidence were consistent with the reference samples from Rocio, whereas the other blood and hair evidence could not eliminated as coming from reference samples from appellant and Yvette. While appellant suggests the circumstantial evidence might have pointed toward Rocio, none of the physical evidence implicated her as being involved in the actual murder and instead pointed to appellant as the perpetrator.

Appellant further suggests the prejudicial impact of the *Crawford* error is demonstrated by the procedural history of this case, and that his guilt was "not unquestionably established by other testimony, as shown by his first trial, where the jury hung in the absence of Ramon's statement and other evidence." At the first trial, however, the jury heard substantially similar evidence, through the testimony of Detective Arnold and appellant's younger brother, that appellant possessed a shotgun. The physical evidence was the crucial difference between the first and second trials. Indeed, the hair evidence was not introduced or even discovered in time for the first trial. The first jury did not hear that appellant's reference hairs could not be eliminated as the source of hairs found on the blue pants stained with Yvette's blood, on the tube sock in the bag of burned clothes, and recovered from the autopsy table, and that none of the blood or hair was consistent with Rocio's reference samples.

While the admission of Ramon's hearsay statements violated *Crawford,* the prejudicial impact of such evidence as to appellant's guilt was harmless beyond a reasonable doubt given the overwhelming weight of the other direct, circumstantial, and physical evidence of guilt in this case.

(Lodged Doc. F, at 40-44.)

The appellate court also found that erroneous admission of Ramon's statements were harmless beyond a reasonable doubt as to the finding the murder was premeditated and deliberated, stating, in part:

The entirety of the record provides extremely strong evidence of premeditation and deliberation, entirely independent from Ramon's statements, and renders the evidentiary error harmless beyond a reasonable doubt. Appellant and Rocio broke up on Saturday or Sunday because Rocio was angry about appellant's relationship with other women. On Monday morning, May 7, 2001, appellant clearly went to some effort to get Yvette out of her house as soon as possible. Around 9:40 a.m., he called and spoke to her mother, who declined to wake up Yvette and give her the message. Appellant called again from his neighbor's house and arranged for Yvette to pick him up. Appellant told Anna Corp and her son that he was going to make a call and wait for a ride, and they saw appellant get into a small white car which was similar to Yvette's white Hyundai.

If appellant needed to just speak with Yvette, he could have walked to her house or talked with her on the telephone when she answered his second call. Instead, appellant seemed determined to get Yvette out of her house that morning. Yvette apparently complied with his request instantly because her mother testified that it was unusual for Yvette to leave her room without making the bed and cleaning up, and to leave without her purse. The strong inference was that appellant said something to Yvette which was designed to make Yvette feel that she needed to speak with him immediately.

At some point that morning or in early afternoon, appellant and Yvette drove out to the canal bank, located in the midst of agricultural fields and far away from any populated areas. Appellant told Rocio that Yvette "just turned around" before he shot her, and that Yvette said " are you going to shoot me or something?' " just before he shot her. It is undisputed that Yvette was killed by a close contact shotgun blast to the face. Wayne Dowdy arrived in the area around 3:30 p.m. to go fishing and stayed for about an hour. He never heard or saw anything, and found the pool of blood as he drove out of the area. Dowdy testified he would have certainly heard a shotgun blast, based on the isolated location, and the implication is that Yvette had been killed at some point prior to 3:30 p.m.

Appellant's actions immediately after the murder were careful and deliberate. He dumped Yvette's body in the trunk, abandoned her car within walking distance to the home of his brother's girlfriend, and found time to clean up and destroy his blood-stained clothes before he arrived at Luisa Andrews's house for the night. When Rocio picked him up on Tuesday, they reaffirmed their love for each other and presumably resumed their relationship, which had just ended within the previous 48 hours because of her anger about his relationships with Yvette and other women.

The facts of this case lead to several undisputed conclusions. Appellant obviously was armed with some type of shotgun when he went to the canal bank with Yvette because of the desolate and remote nature of the area. Yvette picked him up and drove him to the desolate and isolated area in her car. Appellant may have already had the shotgun concealed on his body when he used his neighbor's telephone, or asked Yvette to stop someplace where he obtained the firearm. Indeed, Yvette may have even known appellant was carrying a shotgun. Second, there is no evidence of any type of struggle or argument occurring prior to the shooting, or accidental discharge of the firearm or glancing bullet wounds to her body. There were no assaultive wounds on Yvette's body, aside from the fatal shotgun blast to the head and the drag marks on her legs, and there was no evidence of any defensive wounds on appellant's body when he was arrested 48 hours after the murder. Third, appellant's statements to Rocio demonstrate the premeditation and willfulness of his conduct, that he was pointing a gun at Yvette as she turned to face him just before he shot her. His statements to Rocio strongly imply that he was aiming the gun at Yvette for no apparent reason, such as an argument or a struggle, aside from the premeditated, willful, and deliberate intent to kill her. Fourth, appellant told Jose, his fellow inmate, that he already had the gun with him when Yvette picked him up, that he intended to do something crazy that day, but Yvette picked him up first, that he told Yvette to drive him out to the country, and that Yvette was crying and begging for her life just before he shot her. While Jose was heavily impeached at trial, there is nothing in his testimony that was so inherently unbelievable or incredible that the jury could have completely rejected it.

While Ramon's statements lead to the inference that appellant had access to a shotgun before Yvette was murdered, such a proposition is inherently obvious from the time, place, and manner of the murder: Yvette was shot in the face in the middle of an isolated and desolate area, and there was no dispute that a shotgun was the murder weapon. Thus, the murderer had to make plans, prior to the murder, to bring a shotgun with him to the canal bank. Moreover, Ramon's statements were unclear as to when the gun was taken from his house. Yvette disappeared on Monday. Detective Arnold spoke to Ramon at 1:00 a.m. on Wednesday, and Ramon said he came home from work and found his gun was missing. Ramon did not clarify when he last saw his gun or what day he noticed his gun was missing. In addition, the actual murder weapon was never found and

thus never linked to Ramon or anyone else. While Ramon's statements were probative of appellant's access to a shotgun, such evidence was not crucial to the determination of premeditation, or even as to the nature of the murder weapon since it was undisputed that Yvette was killed by a shotgun blast to the face, and the circumstances of the offense lead to the undisputed conclusion that the murderer had to take the weapon with him to that isolated area to accomplish the murder. Indeed, defense counsel seemed to concede the offense was premeditated first degree murder, and instead argued there was a reasonable doubt as to whether appellant was the perpetrator of the offense.

We thus conclude the erroneous admission of Ramon's statements was harmless beyond a reasonable doubt, and that the jury would have found premeditation and deliberation regardless of Ramon's statements about his missing gun. The *Anderson* guidelines clearly establish premeditation in this case entirely independent of Ramon's statements. Appellant obviously armed himself because he had to be in possession of the shotgun before they drove out to the canal bank. The record strongly implies his motive was to resolve his break-up with Rocio by eliminating one of her rivals. The manner of killing was indicative of a deliberate intent to kill, given the close contact blast which literally blew away the left side of her head. (See, e.g., *Koontz, supra,* 27 Cal.4th at p. 1082.) Finally, appellant's conduct after the murder was completely inconsistent with "a rash, impulsive killing," and instead indicative of premeditation and deliberation. (*Perez, supra,* 2 Cal.4th at p. 1128.)

(Lodged Doc. F, at 44-53.)

Petitioner's argument was reviewed in detail and rejected in a well-reasoned decision. Given the California Court of Appeal's extensive review and analysis of the applicable federal law, there is little of meaningful substance this Court can add. As fully explained by the appellate court, in light of all the evidence in this case, the Crawford violation was harmless beyond a reasonable doubt. There is no showing that this finding was either objectively unreasonable or that such error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) Petitioner's claim should be summarily rejected.

F.    Due Process - Miranda Violation

Petitioner contends that the evidence of his post-arrest conduct and several of his post-arrest statements should have been excluded as in violation of Miranda v. Arizona, 384 U.S. 436 (1966). In addition, Petitioner contends the trial court violated his due process rights because it ruled to exclude such evidence under Miranda in his first trial but then reversed its ruling and allowed such evidence at his second trial.

At Petitioner's first trial, after hearing testimony by the questioning Detective, the Court

excluded all his conduct and statements made after his arrest and during transportation in the car.

However, at the beginning of Petitioner's second trial, the prosecutor requested the court to revisit its prior ruling regarding Petitioner's postarrest statements.  In denying Petitioner's claim, the appellate throughly reviewed the factual and legal background stating, in part, the following:

> THE COURT: I was very unhappy with that ruling. You know, I made the ruling prior to trial but then after I heard the evidence I thought it might have been ill considered. So I will put that on again. And your witness is - [THE PROSECUTOR]: Detective Martin.
> THE COURT: Okay. Let's do that again and see if it comes out the same way...."

The court addressed several other motions in limine, and then conducted an evidentiary hearing on the *Miranda* issue.

The prosecution again called Detective Martin, who again testified the sheriff's department received information from appellant's brother, Ramon, that appellant was staying at a residence on Bell Street in Corcoran. The officers arrested appellant at that residence on the morning of May 9, 2001. At 6:00 a.m., Detective Martin placed appellant in his unmarked vehicle to transport him to the violent crimes office in Visalia. Appellant was in handcuffs and sat in the front passenger seat. Appellant had not been advised of the *Miranda* warnings.

Detective Martin testified that appellant asked him some questions during the drive to Visalia. Appellant's first question occurred within five minutes of leaving the arrest site. Appellant asked why he was being arrested.

> Q Once [appellant] asked you why he was arrested, did you respond?
> A Yes. I told him that he knew why he was being arrested.
> Q Okay. And after that, what happened?
> A Well, then he asked me more than one occasion. And then I told him he knew why he was being arrested. And then he thought for a few seconds and said quote, 'that's really fucked up' unquote. [¶] ... [¶]
> Q Detective Martin, once [appellant] said that, what did you do?
> A Well, I also told him that he even knew who the victim was. [¶] ... [¶]
> Q Okay. Once you told him he knew who the victim was, what happened next?
> A When I told him that he then responded and said yeah, Yvette.
> Q Okay. Did he continue on with this statement?
> A He said that he and Yvette were best of friends. He also asked me if we were going to drive by the crime scene.

Detective Martin testified he never told appellant about the location of the crime scene. They were traveling on Road 28, approximately three miles southwest of the crime scene, when appellant asked if they were going to drive by it. Detective Martin did not respond to appellant's inquiry.

> Well, I continued driving. And I believe he also mentioned that he knew it was on Avenue 184. And that was one of the avenues that I would have to cross in order to come to our violent crimes office. It

was at that point when I got onto Avenue 184 that he looked in the
direction of the crime scene. And I noted that at the time.

Martin testified appellant turned around and looked out the front passenger
window to his right. Appellant's eyes were faced away from Martin, and Martin
conceded he did not know whether appellant was looking toward the crime scene
or just looking out the window.

Detective Martin testified he did not say anything to appellant about the
crime scene:

I know I was trying to avoid asking any questions. The only thing I
recall actually telling him was that he knew why he was being
arrested and he knew the victim.

Martin further testified that a person could see the crime scene from Avenue 184.
He did not intentionally drive appellant by the crime scene.

I looked it up on the map and I knew the area from Corcoran to
Visalia. There is only a couple of northbound roads you can take, it
wouldn't be Road 28. And then you would turn on Avenue 184 to
go north on either Road 36 or Road 48 or Road 60 or 68. And I
believe I turned on Road 36.

Martin testified he took the "back roads" and left Corcoran on Road 28. He
traveled north on Road 28 and turned east on Avenue 184. Martin testified that he
drove past the crime scene while on Avenue 184. The crime scene was about two
and a half miles after he turned from Road 28 to Avenue 184.

Detective Martin testified that after they passed the crime scene, he made a
comment to appellant:

"... The two things that I noted was that he-I told him that I couldn't
ask him questions about the case, the investigation. I did mention
to him that, you know, we needed to find this victim. And he also
again mentioned 'that's really fucked up'. And he also stated that
he was not guilty of committing a crime."

Martin testified he did not make the statement about finding the victim's body to
elicit a further statement from appellant.[15]

On cross-examination, Detective Martin testified Sergeant Logue already advised
appellant about the specific charges against him when appellant was taken into custody at
the house in Corcoran. After they left the house, appellant asked Martin why he was being
arrested. Martin believed appellant was "just being obnoxious, playing stupid if you will"
when he asked why he was being arrested. The court granted appellant's motion to strike
Martin's belief on this matter.

After the evidentiary hearing, the prosecutor argued appellant's statements
were voluntary and admissible. Defense counsel argued appellant's statements and
his alleged look out of the window should not be admitted into evidence. Counsel
asserted Detective Martin violated Penal Code section 841 when he responded to
appellant's question about being arrested. Martin was not responsive to appellant's

---

[15] This evidence was not admitted at trial.

questions, and Martin's statements were made "for the purpose of eliciting an incriminating statement." Counsel further argued that appellant's statement-" 'yeah, Yvette' "-must have been made in response to a question, and "[w]e don't know what words were used in regards to when they get on [Avenue 184] going eastbound to drive by the [crime] scene." Counsel also objected to Martin's opinion "as to which way someone is looking when he can see only the back of his head, he can't see his eyes, I think that's speculative."

Thereafter, the court held the prosecution could introduce appellant's postarrest statements and conduct: "They are probative and not the product of an interrogation." However, the jury did not hear any evidence as to the detective's statements about the importance of finding Yvette's body.

## C. *Miranda and Innis*

In the instant case, we are called upon to determine whether Detective Martin's responses to appellant's questions constituted custodial interrogation in violation of *Miranda.* " *Miranda* requires that a criminal suspect be admonished of specified Fifth Amendment rights. But in order to invoke its protections, a suspect must be subjected to *custodial interrogation ....* " (*People v. Morris* (1991) 53 Cal.3d 152, 197, overruled on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

.........................................................................................................................

## E. Analysis

We now turn to appellant's assertions that he was subject to custodial interrogation in violation of *Miranda* and *Innis.* Appellant contends his postarrest statements and conduct in the detective's car, prior to being advised of the *Miranda* warnings, were obtained as the result of the functional equivalent of interrogation. Appellant asserts the detective should have known that "his continued conversation with appellant was reasonably likely to elicit incriminating responses from him." Appellant argues the detective should have simply complied with section 841 and advised him of the reason for his arrest. Instead, the detective "went far beyond responding" to appellant's request for information about the charges, the detective "taunt [ed] appellant with his knowledge of the crime" and invoked "the image of a dismembered body to be found" in a successful effort to obtain inculpatory statements from appellant.

There are several problems with appellant's argument. First, the entirety of the record reflects appellant was fully advised of the charges against him when he was arrested in Corcoran, in compliance with section 841.[16]  Thus, appellant was not sitting in the detective's car in the early morning hours of May 9, 2001, and wondering why he had been taken into custody.

Second, appellant was not a passive listener to coercive statements about the evidence against him. The instant case is a far cry from *Boyer* because appellant was not the intended recipient of an officer's lengthy and accusatory interrogation in the face of repeated invocations of his rights to silence and to an

---

[16] As we will discuss *post,* section 841 prescribes the formality for effecting an arrest and requires the arresting officers to inform the arrestee of the reason for the arrest. (*Gomez v. Garcia* (1980) 112 Cal.App.3d 392, 397-398.)

attorney. (*Boyer, supra,* 48 Cal.3d at pp. 273-274.) In contrast to *Sims* and *Montgomery,* the detective did not ignore the context of appellant's questions by confronting him with an extensive and detailed description of the evidence against him. (*Sims, supra,* 5 Cal.4th at pp. 441-444; *Montgomery, supra,* 714 F.2d at pp. 202-204.)

Third, appellant began the exchange by repeatedly asking the detective why he was being arrested. As in *Clark* and *Mickey,* appellant initiated the conversation, there is no evidence of coercive conduct, " 'compelling influences' [or] 'psychological ploys' " to provoke him, and his questions and statements were volunteered. (*Clark, supra,* 5 Cal.4th at pp. 985-986; *Mickey, supra,* 54 Cal.3d at pp. 649-650.)

Fourth, the detective's reply was brief, limited, and completely responsive to appellant's question. Appellant asked why he was being arrested. The detective replied: " 'You know why you're being arrested.' " Appellant paused for a few seconds and said, " 'That's really fucked up.' " The detective continued: " 'You know who the victim is.' " Appellant again paused and then said, " 'Yeah, Yvette.' " The exchange in the instant case is nearly identical to the situations discussed in *Taylor, Conley,* and *Jackson,* where the defendants repeatedly asked why they were being arrested, the officers gave limited, brief, and responsive answers, and the defendants thereafter made inculpatory statements. The officer in *Taylor* replied to the defendant's repeated demands for an explanation with the declaration: " 'You can't be growing dope on your property like that.' " (*Taylor, supra,* 985 F.2d at pp. 6-7.) Yet *Taylor* held the officer's response was "cursory and directly responsive" to the defendant's question about the pending charges. (*Id.* at p. 8.) In *Conley,* defendant requested an attorney but demanded to know the evidence against him. *Conley* held the officer's responses-a detailed description of the evidence-did not "fit" the definition of interrogation because the "mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory." (*Conley, supra,* 156 F.3d at p. 83.) *Jackson* similarly held that the officer's reference to a drug intermediary, in response to the defendant's questions about the charges, did not constitute interrogation. (*Jackson, supra,* 863 F.2d at pp. 1172-1173.) Indeed, the detective's responses to appellant were even more brief and limited than the statements made in other cases, were completely responsive to appellant's question, and were not accusatory or related to the evidence against him.

In addition, the detective's responses were far more innocuous than the situations in *LaPierre* and *Payne,* where the defendants were passive listeners while officers discussed the charges and evidence against them. Those cases, however, concluded the defendants were not subject to the functional equivalent of interrogation because the officers' statements did not invite responses from them, and that brief and declaratory descriptions of the charges and evidence does not constitute interrogation for purposes of *Miranda.* (*Payne, supra,* 954 F.2d at pp. 202-203; *LaPierre, supra,* 998 F.2d at pp. 1466-1467; see also *U.S. v. Moreno-Flores* (9th Cir.1994) 33 F.3d 1164, 1169.) Moreover, the defendant in *Haley* was expressly informed that his fingerprint was found at the crime scene, but such a "brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response." (*Haley, supra,* 34 Cal.4th at p. 302.)

Fifth, the detective did not fall down the "slippery slope" of using appellant's questions as an invitation to discuss the evidence against him or ask

specific questions about the crimes. (*Montgomery, supra,* 714 F.2d at p. 204.) Instead, appellant continued to engage in conversation by asking if they were going to drive by the crime scene. It is undisputed, however, that the detective did not respond to this question in any way.

Sixth, there is no evidence the detective intentionally drove by the crime scene, or suddenly changed his route as a result of appellant's statements. Appellant was not subjected to a "contrived situation" to provoke a response. (*U.S. v. Benton* (3rd Cir.1993) 996 F.2d 642, 644.) The detective did no more than drive past the crime scene while taking the most direct route to the office and, as explained in *Innis,* it cannot "seriously be argued that this 'subtle compulsion' would have constituted 'interrogation' within the meaning of the *Miranda* opinion." (*Innis, supra,* 446 U.S. at pp. 303-304, fn. 10.) Therefore, appellant's glance out of the window, in the general direction of a secluded crime scene about one mile away, was not the result of the functional equivalent of interrogation.

Seventh, appellant asserts the detective failed to comply with section 841 when he responded to his question about being arrested. As noted *ante,* section 841 prescribes the formality for effecting an arrest. (*Gomez v. Garcia, supra,* 112 Cal.App.3d at pp. 397-398.) Section 841 states:

> "The person making the arrest must inform the person to be
> arrested of the intention to arrest him, of the cause of the arrest,
> and the authority to make it, except when the person making the
> arrest has reasonable cause to believe that the person to be arrested
> is actually engaged in the commission of or an attempt to commit
> an offense, or the person to be arrested is pursued immediately
> after its commission, or after an escape. [¶] The person making the
> arrest must, on request of the person he is arresting, inform the
> latter of the offense for which he is being arrested."

When there is an appreciable lapse in time such that the person arrested would not necessarily be familiar with the circumstances justifying the arrest, section 841 requires a formal advisement. ( *Johanson v. Department of Motor Vehicles* (1995) 36 Cal.App.4th 1209, 1218.) It is well settled, however, that strict compliance with section 841 is not required. (*People v. Braun* (1973) 29 Cal.App.3d 949, 969, disapproved on other grounds by *People v. Green* (1980) 27 Cal.3d 1, 25, fn. 10.)

Appellant makes much of the detective's alleged violation of section 841 when he responded to appellant's question, and asserts that he would not have been subject to the functional equivalent of interrogation if the detective simply complied with section 841. An officer's advisement which complies with section 841 constitutes "words or actions normally attendant to arrest," which *Innis* expressly excluded from the definition of interrogation. ( *People v. Celestine* (1992) 9 Cal.App.4th 1370, 1374.) As we have noted, however, another deputy already complied with section 841 when appellant was arrested at the house in Corcoran. Thus, the detective herein did not "violate" section 841 when he responded to appellant's questions. Moreover, we have already concluded the detective's responses did not constitute the functional equivalent of interrogation.

Appellant insists he was subject to coercive methods of interrogation during the entire exchange with the detective. Appellant relies on the following three cases. In *Oregon v. Elstad* (1985) 470 U.S. 298, the defendant was asked direct questions about his role in a burglary and clearly subject to custodial interrogation; the disputed issue was whether his statements were involuntary and tainted his subsequent confession. (*Id.* at pp. 301-303, 314-316.) In *Fellers v.*

31

*United States* (2004) 540 U.S. 519, the defendant was indicated by a grand jury but was not in custody; officers visited him at his house and asked him direct questions, in the absence of counsel or waiver of counsel. The court held the defendant's Sixth Amendment rights were violated because the officers deliberately elicited information from the defendant even though he had been indicted. (*Id.* at pp. 524-525 .) In *U.S. v. Orso* (9th Cir.2000) 234 F.3d 436, the defendant was asked direct questions in violation of *Miranda,* and his pre-*Miranda* statements were found involuntary and tainted his post- *Miranda* admissions. (*Id.* at p. 442.) Appellant's reliance on these cases is misplaced, however, because *Elstad, Fellers,* and *Orso* involved completely different situations and are clearly inapplicable to the facts and circumstances of the instant case.

Appellant also relies on *Withrow v. Williams* (1993) 507 U.S. 680 ( *Withrow* ) in support of his argument that he was subjected to the functional equivalent of interrogation. In *Withrow,* police officers learned the defendant might have information about a double murder, visited him at his house, and asked if he would go to the police station for questioning. The defendant agreed. The officers searched the defendant but did not handcuff him, and drove him to the station in an unmarked car. A contemporaneous police report, however, stated the defendant was arrested at his house. At the station, the officers questioned defendant about his knowledge of the crime but did not advise him of the *Miranda* warnings. The defendant answered their questions and initially denied any involvement, but began to implicate himself. The officers continued to ask questions and assured the defendant their only concern was the identity of the perpetrator. (*Id.* at p. 683.) When defendant persisted in denying his involvement, an officer stated:

"'You know everything that went down. You just don't want to talk about it. What it's gonna amount to is you can talk about it now and give us the truth and we're gonna check it out and see if it fits or else we simply gonna charge you and lock you up and you can just tell it to a defense attorney and let him try and prove differently.'" (*Withrow, supra,* 507 U.S. at p. 683.)

The defendant then admitted he furnished the weapon to the killer and made other inculpatory statements. The officers subsequently advised him of the *Miranda* warnings. In a habeas proceeding, both the district court and the Sixth Circuit held the defendant was subject to custodial interrogation and excluded his pre- *Miranda* statements. The courts also found his post- *Miranda* statements were involuntary and admitted in violation of due process, even though neither party raised that issue. (*Withrow, supra,* 507 U.S. at pp. 684-685.)

*Withrow* did not address the underlying merits of the *Miranda* issue. Instead, *Withrow* limited its grant of certiorari to the question of whether the defendant could seek habeas review of the *Miranda* issue, given the limitations on federal habeas review contained in *Stone v. Powell* (1976) 428 U.S. 465 (*Stone* ). (*Withrow, supra,* 507 U.S. at pp. 685-686.) *Stone* held that when a State has given a full and fair chance to litigate a Fourth Amendment claim, federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure. (*Withrow, supra,* 507 U.S. at pp. 682-683.) *Withrow* held *Stone's* restriction on the exercise of federal habeas jurisdiction did not extend to a state prisoner's claim that his conviction rested on statements obtained in violation of *Miranda.* (*Withrow, supra,* 507 U.S. at p. 683.) *Withrow* further held, however, the lower courts improperly considered the involuntariness of defendant's post- *Miranda* statements. The habeas petition raised no independent due process claim, and the State was prejudiced by the court's failure to afford it an opportunity to present evidence at the habeas

proceeding on that issue. (*Id.* at pp. 695-697.)

*Withrow* is completely inapposite to the instant case. The defendant therein was subjected to direct questioning and identical to the "Christian burial coercion. More importantly, however, the United States Supreme Court never reached any *Miranda* issues and only addressed the limits of federal habeas review on the procedural history of the case.

Finally, appellant asserts the detective's final statements to him-that they needed to find the victim-were coercive and identical to the "Christian burial speech" condemned in *Brewer v.. Williams* (1977) 430 U.S. 387 (*Brewer* ). The situation in *Brewer* is often cited as an example of the functional equivalent of interrogation. *Brewer,* however, was decided *before Innis* and was based on the attachment of a defendant's right to counsel.

In *Brewer,* a 10-year-old girl disappeared. Someone saw the defendant put a bundle containing the girl in his car and drive away. The defendant ultimately surrendered. He appeared in court, he conferred with an attorney, and the court advised him of the *Miranda* warnings. The defendant was arraigned for kidnapping, and then he was transported by police car from Davenport to Des Moines, Iowa. The defendant's attorney advised the detective that he could not question defendant during the drive. During the 160-mile drive, however, the detective made several statements to the defendant. The detective knew defendant was a former mental patient and deeply religious. (*Brewer, supra,* 430 U.S. at pp. 390-393.) The detective addressed the defendant as " 'Reverend,' " (*id.* at p. 392), and asked him to think about several things. The detective said that snow was predicted, he felt that the defendant was the only person who knew where the little girl's body was, and that if snow covered the body they might not be able to find it. The detective further stated that " 'since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.' " (*Id.* at pp. 392-393.) The defendant asked the detective why he thought their route would take them past the girl's body, and the detective falsely responded that he knew the body was in the area of a town they would be passing. The detective also admonished the defendant not to answer him, but to just think about it during the drive. ( *Ibid.*) Defendant's reaction to this "speech" was to disclose the body's location and lead the officers to that site and to other evidence.

*Brewer* characterized the detective's statements to the defendant as an "interrogation" and held "[t]here can be no serious doubt" that the detective "deliberately and designedly set out to elicit information from [defendant] just as surely as-and perhaps more effectively than-if he had formally interrogated him." (*Brewer, supra,* 430 U.S. at p. 399.) Moreover, the State conceded the speech was tantamount to an interrogation within the meaning of *Miranda.* (*Id.* at p. 399, fn. 6.) *Brewer* held that in giving the "Christian burial speech," (*id.* at p. 400), the detective "purposely sought ... to obtain as much incriminating information as possible." (*Id.* at p. 399.) *Brewer* held the defendant's response to the detective's statements did not constitute a waiver of his right to counsel. *Brewer* specifically based its ruling on the violation of defendant's Sixth Amendment rights, and held he was interrogated in violation of the right to counsel. (*Id.* at pp. 401, 404-406.)

Appellant contends he was subjected to a situation similar to *Brewer* when the detective herein mentioned that it was important for them to find the rest of

33

the victim's body. Appellant asserts this statement provides evidence that he was subject to coercive interrogation techniques. The instant situation, however, is inapposite to *Brewer.* The detective did not begin his exchange with appellant by mentioning that it would help to find Yvette's body, or playing upon any known psychological weaknesses to extract an inculpatory statement from him. Appellant's reliance on *Brewer* is misplaced because his underlying assumptions are refuted by the undisputed sequence of events in the detective's car: appellant asked why he was being arrested, the detective replied, appellant responded with an expletive, the detective finished his reply about the victim, appellant mentioned Yvette, appellant asked about going by the scene, and the detective did not respond. It is undisputed that the detective made his remarks about finding Yvette's body *after* these exchanges, appellant did not make any statements in response to the detective's remarks, appellant never gave any formal statement to the police, and the jury herein never heard any of this evidence.

Moreover, there is no support for appellant's argument that the detective's final statements indicated some retroactive intent to deliberately elicit an incriminating response from appellant when he replied to appellant's questions about the reason for his arrest. As we have already explained, the detective's responses to appellant were limited, brief, responsive, and consistent with those approved of in the *Taylor, Conley,* and *Jackson* cases. Appellant's statements were spontaneous and voluntary, and he was not subject to the functional equivalent of interrogation.

We acknowledge that if appellant had responded to the detective's final comments about finding Yvette's body, we might have been presented with a situation similar to *Brewer,* which would have required exclusion of any response. If appellant subsequently waived his *Miranda* rights and agreed to give an interview, we might have been presented with a situation similar to *Elstad* and faced with the question of whether his post- *Miranda* statements were tainted by the *Brewer* violation. Neither scenario occurred in this case. As we have already noted, appellant never responded to the detective's final statement about finding Yvette, he did not make any further statements in the car, he never waived his *Miranda* rights, and he never gave a formal statement to the police.

We thus conclude appellant's argument that he was subject to custodial interrogation is refuted by the overwhelming weight of authority of state and federal cases which have applied *Innis* to both similar and nearly-identical situations. While appellant relies on *Innis* and asserts he was subject to the functional equivalent of interrogation, appellant fails to acknowledge the United States Supreme Court held the officers' conversation in *Innis*-about the importance of finding a shotgun near a school for handicapped children-was not reasonably likely to elicit an incriminating response. The same conclusion must be reached in this case. The undisputed evidence demonstrates that appellant initiated and continued the conversation, the detective gave brief and limited answers which were entirely responsive to appellant's inquiries, the detective did not use appellant's questions as an excuse to discuss the evidence against him, the detective did not engage in any contrived situations to provoke a response from appellant, and appellant was not subject to coercive conduct, compelling influences, or psychological ploys. While the detective's final statements about finding Yvette's body might have been close to *Brewer,* the detective's statements occurred *after* appellant's spontaneous questions, appellant's volunteered comment about Yvette, his inquiry about the crime scene, and his glance out the window. More importantly, appellant did not make any inculpatory responses to the detective's statements about finding Yvette, and none of this evidence was introduced to the jury.

        We also note the probative value of the inferences from appellant's
postarrest statements-that he knew the reason for his arrest and that Yvette was
the victim-was necessarily minimal in this case. The jury herein learned that
appellant was well aware of the reasons for his arrest because he had already been
advised of the charges when he was taken into custody that morning, In addition,
the jury heard Rocio's testimony that she told appellant about her interview with
the sheriff's detectives when they talked on Tuesday evening. Rocio told appellant
Yvette was missing and they were looking for appellant. Thus, the fact that
appellant knew the reason for his arrest and that Yvette was the victim could be
described as cumulative in light of other
evidence.

(Lodged Doc. F, at 54-83.)

        The appellate court's decision is complete in and of itself, and the reasonableness of such

decision is evident from the thorough and detailed analysis.  The appellate court discussed at

length the Supreme Court's holdings in Miranda and Innis, and several Court of Appeals'

decisions relevant to the determination of what might or might not constitute the functional

equivalent of "interrogation" as applicable to the circumstances present here.  (See Lodged Doc.

F, at 58-73.)  In finding that Detective Martin's statements and conduct while transporting

Petitioner did not amount to interrogation, the state court properly compared the factual

circumstances present in Miranda, Innis, and their progeny, and reasonably concluded that

Petitioner was not subjected to "custodial interrogation" within the meaning of the clearly

established Supreme Court authority.  Petitioner has not shown, and likely cannot show, that the

state courts' decision was contrary to any controlling Supreme Court authority or an

unreasonable determination of the facts in light of the evidence presented, and his claim should

be rejected on the merits.  28 U.S.C. § 2254(d).

        With regard to Petitioner's claim that the trial court's reversal of its prior ruling on the

Miranda motion resulted in a due process violation, it too is without merit.  In denying his claim,

the appellate court held as follows:

        Appellant contends the trial court violated his due process rights based on
the procedural history of the Miranda issue. As we explained in section II, ante,
the trial court granted appellant's motion at his first trial to exclude his postarrest
statements and conduct, and appellant's first trial ended in a hung jury. At the start
of the second trial, the court granted the prosecution's motion to reconsider the
Miranda issue, conducted another evidentiary hearing, and held appellant's
postarrest statements and conduct were admissible. Appellant relies on this
sequence, points to several remarks made by the court at the conclusion of the
second trial, and asserts the court changed its Miranda ruling simply to obtain a
conviction in this case in violation of his right to due process. Appellant also cites

to Ramon's hearsay statements, as discussed in section I, *ante,* and asserts the court found the evidence admissible for the same reason.

"In criminal cases there are few limits on a court's power to reconsider interim rulings. [Citations.]" (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1246 (*Castello* ).) "A court's inherent powers are wide. [Citations.] They include authority to rehear or reconsider rulings: '[T]he power to grant rehearings is inherent,-is an essential ingredient of jurisdiction, and ends only with the loss of jurisdiction.' [Citations.]" (*Id.* at p. 1248.)

"A court could not operate successfully under the requirement of infallibility in its interim rulings. Miscarriage of justice results where a court is unable to correct its own perceived legal errors, particularly in criminal cases where life, liberty, and public protection are at stake. Such a rule would be ' "... a serious impediment to a fair and speedy disposition of causes...." [Citations.]' [Citations.]" (*Castello, supra,* 65 Cal.App.4th at p. 1249.)

The California Supreme Court has held reversal of a judgment on appeal and remand for a new trial "permits ... [the] renewal and reconsideration of pretrial motions and objections to the admission of evidence." (*People v. Mattson* (1990) 50 Cal.3d 826, 849, superceded by statute on other point as noted in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.) The court has treated motions to suppress under *Miranda* as in limine motions which, if granted, are subject to review if the People again offer the evidence at the trial. The court did not limit the power of reconsideration to the same judge who made the orders in the first trial. (*People v. Mattson, supra,* at pp. 849-853.)

Appellant asserts the trial court's decision to change the *Miranda* rulings between the first and second trials was arbitrary and capricious, and the court improperly reconsidered the *Miranda* issue without any change in the law or facts of the case. Appellant suggests the court decided to change the *Miranda* ruling to present the second jury with evidence of appellant's postarrest statements and thus avoid another mistrial, and asserts there is no other reason to explain the court's second ruling.

Appellant's baseless assertions are refuted by the entirety of the record. At the first trial, the court conducted an evidentiary hearing pursuant to Evidence Code section 402, determined appellant's statements were obtained in violation of *Miranda,* and denied the prosecutor's request to introduce this evidence to the jury. At the beginning of the second trial, the prosecutor requested the court to reconsider the *Miranda* issue. Appellant quotes Judge Moran as granting this motion because he characterized his previous *Miranda* ruling as "ill considered." The entirety of the record places Judge Moran's comment in context:

"I was very unhappy with that ruling. You know, I made the ruling prior to trial but then after I heard the evidence I thought it might have been ill considered. So I will put that on again.... [¶] ... [¶] ... Let's do that again and see if it comes out the same way...."

Thereafter, the court conducted another evidentiary hearing and concluded appellant's statements were not obtained in violation of *Miranda.*

Appellant's due process argument is based on the flawed assumption that the trial court's *Miranda* ruling at the first trial was correct, and its decision to admit the evidence at the second trial was incorrect. As we have exhaustively discussed in section II, *ante,* the trial court had good reason to reconsider the

*Miranda* issue, and it made the correct decision when it found appellant was not subject to custodial interrogation. During the evidentiary hearings, the parties orally argued the *Miranda* issue and did not submit written briefs or pleadings, but they consistently agreed that *Innis* controlled the determination of whether appellant was subject to the functional equivalent of interrogation. The trial court herein only had to reconsider the *Innis* decision, and it would have realized that appellant was not subject to the functional equivalent of interrogation and his postarrest statements and conduct were admissible.

Even if the court's *Miranda* ruling at the second trial was incorrect, however, the record herein rebuts appellant's claim that the court lacked any basis to reconsider the *Miranda* issue. At the very least, the circumstances of the *Miranda* issue presented a close question as to whether appellant was subject to custodial interrogation. Moreover, the court's comments at the beginning of the second trial demonstrated that it had thought about the *Miranda* issue throughout the first trial, and it was willing to consider whether it had made a mistake. There is no evidence the court changed its ruling simply to facilitate a verdict in the second trial.

(Lodged Doc. F, at 91-94.)

The appellate court's ruling was based entirely upon state law and this Court cannot reconsider the state court's determination of its own law.  Moreover, Petitioner has not presented any Supreme Court authority to demonstrate that a judge's decision to reconsider a prior Miranda ruling, or any prior evidentiary ruling, might rise to the level of a federal due process violation.

Furthermore, this case is distinguishable from the state court cases cited by the appellate court because those cases all involve a second judge changing a previous judge's ruling. However, in this case, the trial court judge was the same at both trials, and the court expressed its discomfort with its prior ruling and chose to revisit the issue by way of evidentiary hearing.  (RT 7.)  During the hearing, Petitioner was represented by counsel and was able to cross-examine Detective Martin and argue that his statements and conduct should be suppressed under Miranda. Thus, Petitioner's due process rights were not violated.  There is simply no Supreme Court authority that prohibits a trial court judge from revisiting and reversing a prior ruling under Miranda.  This claim is without merit.

In any event, any alleged error was not harmful to Petitioner and habeas relief is foreclosed.  Admission of evidence obtained in violation of Miranda is subject to review for harmlessness.  See e.g. Williams v. Stewart, 441 F.3d 1030, 1051 (9th Cir. 2006, as amended Apr. 18, 2006). The standard is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal

1    quotation marks and citation omitted).

2        The objectionable evidence derived from Detective Martin's alleged "interrogation" was

3    that Petitioner acknowledged he knew the victim in the case was "Yvette" and he surmised the

4    crime scene might have been somewhere near Avenue 184.  (RT 26-29, 38.)  When viewed in

5    light of the context of the other evidence presented at trial, these statements were not prejudicial

6    within the meaning of <u>Brecht</u>.  The jury also heard testimony by Rocio Macia, Petitioner's former

7    girlfriend, that she had previously been questioned by police regarding Yvette's murder and she

8    discussed her questioning with Petitioner and asked about his involvement, prior to his arrest.

9    (RT 136, 167-209, 573; Lodged Doc. F, at 13-14.)  Given this testimony, there was evidence that,

10   even if Petitioner was somehow innocent, he would have been aware of the victim's name and

11   potential location of the murder.  Accordingly, the statements made to Detective Martin were of

12   little substance and it cannot be said that the alleged Miranda error had a "substantial and

13   injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S.

14   at 638.

15   G.    <u>Expert Testimony Regarding Hair Comparison Evidence</u>

16        Petitioner contends the trial court erred by allowing the hair comparison evidence to be

17   introduced because such expert testimony was scientifically unreliable.

18        In denying Petitioner's claim, the state appellate court held as follows:

19   A. *Background*

20        At the first trial, the prosecution did not seek to introduce any microscopic
     hair comparison evidence. After the mistrial, the prosecution requested the
21   Department of Justice's Fresno Regional Laboratory to conduct hair comparison
     analysis on the evidence in this case, and compare the hairs recovered from the
22   bag of burned clothes and the autopsy table to reference samples from appellant,
     Yvette, and Rocio.
23
         At the beginning of the second trial, defense counsel moved to exclude the
24   hair comparison evidence as inadmissible pursuant to *Daubert v. Merrell Dow
     Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert* ) and *Williamson v.
25   Reynolds* (E.D.Okla.1995) 904 F.Supp. 1529, 1558 (*Reynolds* ). Counsel argued
     such evidence was inadmissible unless the court conducted a *Kelly/Frye* hearing,
26   and such a hearing would demonstrate that hair comparison analysis was
     unreliable.
27
         The prosecutor replied that hair comparison evidence was admissible in
28   California pursuant to *People v. Pride* (1992) 3 Cal.4th 195 (*Pride* ). The
     criminalist would testify that certain hairs were similar to appellant's reference

                                        38

samples, but not that the hairs belonged to appellant. The court permitted the prosecution's expert to testify about hair comparison analysis and did not conduct a *Kelly/Frye* hearing.

At trial, the prosecution's expert was Nancy McCombs, a criminalist from the Department of Justice's Fresno Regional Laboratory. She had been with the laboratory for 13 years, and had worked with trace evidence and hair analysis for 10 years. In addition to her general education in biology and chemistry, she had taken courses at the California Criminalistics Institute in Sacramento on forensic microscopy, sexual assault evidence, and hair analysis, all of which pertain to hair examination. McCombs also took yearly proficiency tests on hair examination. McCombs previously testified as a hair comparison expert in other cases.

As set forth *ante,* McCombs testified she conducted microscopic examinations of hairs recovered from the white tube sock, the bloody pants, and from the autopsy table, and these hairs could not be eliminated as coming from appellant based on his reference samples. She excluded Rocio and Yvette as the source of these hairs. On cross-examination, McCombs explained the meaning of not being able to eliminate a reference hair from the evidentiary samples:

"It means that there are characteristics that are shared by both of those hairs that are similar. It's not a strong statement like an elimination is. [¶] If I took my hair and mounted it and I took this young lady's hair and mounted it, I could probably eliminate our hairs from coming from the same source. That's a strong statement. [¶] Inconclusive, which is another one of the statements, means that when I'm looking at two hairs, either there's not enough information there. Maybe the hair was cut, there was some features that looked similar, but some that didn't, to lead me to just not feel comfortable saying they looked similar or not similar. [¶] When I say similar, I can't really find anything dramatically different. But does that mean that that hair came from that source? No."

B. *Analysis*

In *Pride, supra,* 3 Cal.4th 195, the California Supreme Court held that "[h]air comparison evidence that identifies a suspect or victim as a possible donor has been routinely admitted in California for many years without any suggestion that it is unreliable under *Kelly/Frye.* [Citations.]" (*Id.* at p. 239.) *Pride* held a trial court is not obliged to conduct a *Kelly/Frye* hearing to determine the admissibility of such evidence. (*Ibid.*)

Appellant acknowledges the ruling in *Pride,* but asserts that case has been undermined by subsequent legal and scientific opinions that hair comparison analysis is unreliable. Appellant's legal argument is based on *Reynolds, supra,* 904 F.Supp. 1529, where a district court applied the *Daubert* test to hair comparison analysis and determined that such evidence was not scientifically reliable. (*Id.* at p. 1558.) Although *Reynolds* was later affirmed by the Tenth Circuit, it was done so based on grounds other than the admissibility of the hair evidence. (*Williamson v. Ward* (10th Cir.1997) 110 F.3d 1508, 1510 (*Ward* ).) Indeed, the Tenth Circuit specifically reversed *Reynolds* ruling on the issue of the hair evidence, asserting that the district court applied the incorrect standard in making its ruling. (*Ward, supra,* 110 F.3d at pp. 1522-1523.) "This assessment requires examining both the reliability of the evidence and the significance it had at trial. The district court here, however, did not perform its analysis under a due process/fundamental fairness standard. Instead, it incorrectly assessed the issue in evidentiary terms under *Daubert* .... Because the court employed the wrong standard, we reverse its ruling that the hair analysis was inadmissible."(*Id.* at p. 1523.)

Other courts have joined the Tenth Circuit's rejection of *Reynolds.* (See, e.g., *U.S. v. Santiago* (D.Puerto Rico 2001) 156 F.Supp.2d 145, 151-152; *Bryan v. State* (Okla.Crim .App.1997) 935 P.2d 338; 359, fn. 62; *Johnson v. Com.* (Ky.1999) 12 S.W.3d 258, 263; *State v. Southern* (Mont.1999) 980 P.2d 3, 13-18.)

"Upon independent research, the Court finds that the principles and procedures underlying hair and fiber evidence are overwhelmingly accepted and reliable. As one treatise notes, '[t]he cases in which courts have excluded hair evidence are so rare that they have literally amounted to only a handful of precedents.... In contrast to the few cases excluding hair evidence, a large body of case law reflects the courts' receptivity to hair analysis'. [Citations.] The overwhelming majority of courts that have dealt with the issue have found hair comparison evidence to be reliable. [Citations.] This Court chooses to side with the majority of jurisdictions." (*U.S. v. Santiago, supra,* 156 F.Supp.2d at p. 152.)

We decline to follow *Reynolds* because the doctrine of stare decisis compels us to follow *Pride* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and also because *Reynolds* has been rejected by the Tenth Circuit and other courts. Moreover, the criminalist in the instant case clarified the nature of her analysis: she could not testify the hairs seized from the white sock, the bloody pants, and the autopsy tables came from appellant, but that appellant's reference hairs could not be eliminated as the sources of these items.

Appellant asserts the scientific basis for the reliability of hair comparison analysis has also been severely undermined. Appellant cites to a 2002 study about hair comparison analysis which, he asserts, demonstrated that hair comparison analysis suffers from a high rate of false positives. (Houck & Bodowle, *Correlation of Microscopic and Mitochondrial DNA Hair Comparisons* (2002) 47 J. Forensic Sci. 964.) One of the authors of this study, however, subsequently published another study which summarized his previous findings, noted that *Reynolds* had been effectively overruled by *Ward,* and concluded microscopic hair comparison analysis was reliable under both the *Kelly/Frye* and *Daubert* tests. (Houck et al., *Locard Exchange: The Science of Forensic Hair Comparisons and the Admissibility of Hair Comparison Evidence: Frye and Daubert Considered* (Mar. 2, 2004) Modern Microscopy Journal, pp. 6-8.) As explained in the article's conclusion:

"Forensic examinations of human hairs have been performed for years. Depending on the microscopist's training and experience, and the condition of the evidence, the potential rate of error of the technique is very low. The techniques are not novel and there exists a body of literature dealing with human hair characteristics and the reliability of forensic hair comparisons. It is true that hair comparisons, as do all other sciences, depend on the judgement and experience of the examiner; but hair examiners are scientists and not simply technicians. That is why they can reliably make the necessary value judgements that come from their scientific education, training, and experience.

"Professional standards for the practice of forensic hair comparisons have been proffered through international cooperation supported by international symposia. Like other forensic techniques, such as firearms, fingerprints and handwriting comparisons, the forensic comparison of hair has been well-established in the forensic laboratories of the world. Quality assurance safeguards are in place in most forensic laboratories

which make use of specialized training, proficiency testing and peer review. The finding of the same microscopic characteristics in the questioned hair as in the known sample is objective and demonstrable to the trier of fact; the nature and breadth of the inferences adduced can be explained easily by the qualified expert. If warranted, experts are available to re-evaluate the evidence because the method is non-destructive. If the hair evidence is considered important and valued, a careful microscopic examination will provide evidence that is reliable and probative in a criminal investigation and lawsuit. The forensic scientist should welcome the trial judge's gatekeeper role and be able to explain the acceptability of the forensic hair comparison in detail." (Houck et al., *Locard Exchange: The Science of Forensic Hair Comparisons and the Admissibility of Hair Comparison Evidence: Frye and Daubert Considered, supra,* Modern Microscopy Journal, at p. 9.)

We thus conclude the trial court herein properly relied on *Pride,* it was not obliged to conduct a *Kelly/Frye* hearing, and it properly admitted the criminalist's hair comparison analysis. Appellant's legal and scientific objections are without merit.

(Lodged Doc. F, at 97-102.)

Generally, the admissibility of evidence is a matter of state law, and is not subject to review in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920.

To the extent Petitioner's due process claim is premised solely on violations of California law, it is not subject to review in this forum.  In any event, even assuming Petitioner's challenge states a cognizable federal claim, it fails.  As explained by the appellate court, there were clearly legitimate inferences to be drawn from McCombs' testimony that Petitioner could not be excluded from those who might have been the source of the hair evidence discovered in this case.

1  McCombs' testimony was unequivocal that the hair comparison did not provide a positive

2  identification and was relevant only for the limited purpose of demonstrating that Petitioner

3  could not affirmatively be excluded as the one who possibly deposited the hairs in question.

4  Given the relevance and limited purpose of this testimony, Petitioner cannot demonstrate that

5  such evidence rendered his trial fundamentally unfair to the extent of a due process violation, and

6  the state courts' determination of this issue was not contrary to, or an unreasonable application

7  of, clearly established Supreme Court precedent.

8                                         RECOMMENDATION

9          Based on the foregoing, it is HEREBY RECOMMENDED that:

10         1.      The instant petition for writ of habeas corpus be DENIED; and

11         2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

12         This Findings and Recommendation is submitted to the assigned United States District

13  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

14  the Local Rules of Practice for the United States District Court, Eastern District of California.

15  Within thirty (30) days after being served with a copy, any party may file written objections with

16  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

17  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

18  and filed within ten (10) court days (plus three days if served by mail) after service of the

19  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

20  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

21  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

22  Cir. 1991).

24         IT IS SO ORDERED.

25  **Dated:   February 4, 2009**              _____ /s/ **Dennis L. Beck**_____
                                               UNITED STATES MAGISTRATE JUDGE

42